Good morning, Your Honors, and may it please the Court, Doug Keller on behalf of Mr. Cazares. I wanted to begin by briefly discussing the merits of Mr. Cazares' Padilla-based ineffective assistance claim. The merits of his claim are resolved by this Court's recent decision in United States v. Rodriguez-Vega, where this Court held on essentially the same facts that the defendant had received in effective assistance. Let me ask you a question about that. Is it really about the same? It seems to me in this particular matter we're not talking about the challenge to the conviction on itself, which was in Rodriguez. They went up and challenged the conviction in that case. In this particular case, we're talking about a challenge to a conviction that happened many years before this case. In other words, we're talking about a challenge to a conviction that is not a direct appeal using Padilla, but is an appeal of another judgment, which is many years prior. And if we look at the many years prior, we're looking at a judgment then which, if the person was going to challenge it, he could have gone up and challenged it on Padilla or Rodriguez, could have done what he had to do. But in this particular instance, we're looking at a different situation. We're looking at what didn't he do at the time and what he had a chance to do. Does that make the analysis different? Well, two points, Your Honor. First, procedurally, this case is identical to Rodriguez-Vega. In that case, the defendant was convicted and then later filed a habeas petition. Here, it's the same thing. Mr. Casares was convicted of alien smuggling and then later filed a habeas petition. That case has been consolidated with his legal reentry case. So I take your point that there is a timing difference, but at least procedurally, the cases are situated identically. And I think that brings me to what I think is really the government's only substantial argument with respect to our habeas petition, which is whether Mr. Casares timely filed his habeas petition. All right. Well, let's talk about that for just a moment. If I have the timeline correctly, the habeas was started certainly more than one year after the judgment became final. And similarly, it was started more than one year after he was put on inquiry notice, assuming, giving you the benefit of the doubt, that inquiry notice was when he was placed in immigration custody, which would have been in June of 2013. So in either event, it seems to me you're beyond the one year permitted under 2255. So respond to that, if you would, because I agree with you that that is the timeliness is a central issue here and it presents an obstacle to you. So if you would respond. I agree with you factually that the petition was brought much longer or outside of the year from within when the judgment was final. I disagree with you that putting Mr. Casares in removal proceedings put him on inquiry notice that he had received improper advice. And I think really the crux here is the nature of the misadvice. Mr. Casares was never told that you're never going to be in immigration proceedings. If he had been told that, I would agree with you that when he's put into immigration proceedings, he should realize there's something wrong here. But instead, he was told he would be in proceedings, but he was the key is he was never told that the result of those proceedings was that he was almost certainly going to be removed. And the question is, in this case, at what point of this process should he have known that he had been under-advised, essentially, or undersold how likely his removal was? And I think once he was put in proceedings, he continued on his belief that, yes, I'll be in proceedings, but that I'm going to have a chance to win. And so he fought those proceedings consistent with that belief. He hired an immigration attorney out of his own pocket. And then later, he even hired a criminal defense attorney to look into whether he might have received ineffective assistance. He also continued an appeal to the BIA. So he was sort of the poster child for someone who's acting diligently to determine whether he was misadvised. Now, ultimately, that investigation didn't turn up the fact that he'd been misadvised, but that doesn't change the fact that he acted diligently throughout the entire process. And like I said, in many ways, he's sort of the poster child for someone who's trying to fight for his rights and do what he can. But if we look at Hazan versus Galaza, it suggests that your client need not know the legal consequences of the facts, but only the facts. And there he is in jail with a notice to appear. That's right. Why doesn't he know the facts? Because he might not know the legal consequence of the facts, but he knows the facts. Well, two things, Your Honor. I think the first point is critical. When courts say you must not know the legal significance of the facts, what the courts are saying is that you can't know all the factual predicate to your case and then not realize it amounts to ineffective assistance. So when Mr. Casares received the notice to appear at immigration court, he was nothing about that petition tells him that his removal is a virtual certainty, as opposed to you're simply going to be in immigration proceedings. It's just a charging document. And so the proper response to that for someone in Mr. Casares' position was to act consistent with his belief that he had a chance to win. And so he fought that through the administrative process. But at no point was he told the critical fact, and this is the fact he must prove in which is that his removal was virtually certain, and nothing in his proceedings would have clued him into that. Again, this would be a very different case if he had been told you're never going to be in proceedings to begin with. Then I think it would have been fair for someone in Mr. Casares' position to be like, well, wait a minute, this is inconsistent with what I was told. But I think it could be fair. But you're importing into your analysis Rodriguez-Vega, which had not been decided at that time. And what his lawyer said, what attorney Pachter said to him is not the most wonderful language, or it's certainly not virtually certain language. But he said, quote, you know, you're likely to be deported, never say never, end quote. So if Rodriguez-Vega wasn't the law at that point, what's wrong with that statement for putting him on notice? Well, two things. One, Rodriguez-Vega simply echoed this Court's prior decision in Bonilla, where Bonilla said the exact same thing as Rodriguez-Vega, that you must tell people who plead guilty to unambiguous aggravated felonies that their removal is a virtual certainty. But second, and I think more importantly, I think the government even admits at this point that he was misadvised. And the question is, at what point should this pro se litigant understand that? And I think it's important that even in this case, the government maintained until Rodriguez-Vega that he had been properly advised. So what the government is essentially arguing is that Mr. Casares in immigration detention should know the law and the consequence of an aggravated felony conviction better than the government's own attorneys. What's the difference? I want to follow up on Judge Stein's question. What's the difference between you're likely to be deported, never say never, and virtually certain? Virtually certain doesn't say it's a 100 percent chance. Sure. It's a 99 percent chance. Why isn't that the rough equivalent of likely to be deported, never say never? Well, two things. One, I just think they are — I mean, they're just different. One, I think, implies, you know, it's a coin flip essentially. And one says, look, unless something, you know, unforeseeable happens, you're going to get removed. But secondly, in Rodriguez-Vega itself, this Court said that even the attorney's statement that there's a, quote, high likelihood of removal does not accurately state the law. What was the basis for our statement in Rodriguez-Vega that it was virtually certain? I know the language came from Bonilla. I know the virtually certain language came from Bonilla. Right. What's the statistics behind that? There weren't any statistics in the opinion. How do we know, if we're going to hold lawyers to this very, very high standard after Padilla, how do we know what is virtually certain at the BIA? Well, two points, a legal point and a practical point. The legal point is that Bonilla's virtually certain language echoes what the Supreme Court said in Padilla. In Padilla, the Supreme Court talks about someone like Mr. Padilla, his removal being, quote, practically inevitable, an automatic result. They don't use the law. But that's that — in Padilla, they were simply pointing out the fact that there was a statute that said he would be removed. Right. That he — it was unambiguous on point that he would be removed. That doesn't tell us anything about enforcement. It doesn't tell us anything about exercises of prosecutorial discretion. It doesn't tell us anything about any kind of equitable exceptions to that. It simply tells us that there's a statute. Fair enough in Padilla. Sure. But what tells us, how do we get from Padilla to Bonilla and Rodriguez-Vega that we know that it's virtually certain? All we see are the cases in which there are appeals. We don't see — we don't see it. And when somebody wins before the BIA or before an IJ or before some other lower level official at DHS, they don't bring that appeal to us. Sure. But two points. One, I do think this Court is just bound by Padilla and Rodriguez-Vega. But setting that aside, as a practical matter, as Padilla notes, people who are plead guilty to aggravated felonies don't qualify for essentially any form of relief. The relief that's available — I'm sorry, any discretionary form of relief. The relief that's available to an aggravated felon is essentially nothing. It's cat relief, which I think the BIA denies in 99 percent of all cases. It's certain types of visas that essentially no one ever receives. I mean, it's the practical reality when someone pleads guilty to an aggravated felony, they are getting removed unless there's some extraordinary circumstance. And I think that's sort of baked into Rodriguez-Vega's language that it's virtually certain that, yes, a miracle could happen. But a miracle is unlikely. So then I think that goes back to my sort of initial point on the timeliness, that lawyers are supposed to know that. But Mr. Casares, there's no way he was going to know that. And I think it's unfair to hold him to that standard. I think if you look at what he did, he did everything he could to figure out whether he'd been misadvised. I think he did more than nearly any client will, which is that he fought it throughout the immigration process. He hired two different lawyers, and essentially no one was being straight with him. And so I think it's unfair to say that, well, you did everything you could, but too bad. You should have known better than your own attorneys. Well, here's my problem, and I keep challenging you a little bit at a time. But it seems to me that your client knew facts when he was sentenced on December in December 2012. In fact, at the change of plea hearing, the magistrate judge advised him of certain facts. Seems to me like when he was put in deportation proceedings in June of 2013, he was again given a notice to appear and put in jail. Then the IJ said he was following precedent in August of 2013. And again, the motion was not brought until September of 2014. Well, why is that not enough? I mean, he's been in there in December 2012. He was put in the deportation proceedings in 2013. The IJ says, I'm following precedent, and I'm going to do what I got to do in 2013. How can you suggest that doesn't put him on inquiry and not do what it needs to be done for the timeliness to run? Well, sure. Two points, Your Honor. First, it's a question of what he was on notice of. And the facts he knew at sentencing were that he would be in deportation proceedings. That's all he knew. That's not enough. But then he went in them. Sure. And then the IJ says, I'm following precedent, and you're done. Sure. I think he was then allowed to rely on the administrative process to determine if the IJ got it right. After all, IJs do not always get to do that. What says that? What case do I look at that says that? There's nothing on point, Your Honor. I mean, this is the problem. You didn't even make that argument to the district court, number one. But even allowing you to make it here, I'm saying, where do I get to that? What I'm looking for, as you and I and my colleagues have tried to emphasize to you, is we're looking at this, and we're trying to find out what it is that we can say the statute runs. And now what you're arguing to me is, yeah, I knew I was in trouble in 2012, but my attorney says that's OK. In June 2013, I was put in, and I was in jail. And then in August 2013, an IJ who's in charge of this stuff says I'm wrong, and I'm going, and I'm losing. Sure. A few points, Your Honor. One, we've always argued in this litigation that essentially the discovery rule is part of our argument for why this claim is timely. And I think the question is, when, at what point in this process, he should have known not that he would be removed, but that he'd been under-advised. And so even when the immigration judge tells him, I think you're removable, that's not the final word. He can still have the right to wait and see how the ---- But then it has to be extraordinary circumstances, doesn't it? No, because I'm still ultimately operating under the discovery rule, which is when my client knew or should have known that he would be ordered removed. And if this were a civil claim, if this were someone simply suing his attorney for malpractice, I don't think we would think that the second the attorney tells him something that's not legally true, that the client just immediately know that, yes, that's wrong advice. But that's essentially what I think the district court was holding my client to. I think he can wait. He can rely on his attorney and assume, and this is what I think Petia says, that he will be accurately advised. And I think the harder question is, at what point in this process, he should have known that. And so from certainly my point of view, he was not an inquiry notice that he had been under-advised or undersold the likelihood of removal until the removal order was final. I'm seeing I'm out of time, but if possible, I'd like to reserve time for that. Okay. I understand your argument. Thank you. Thank you, Mr. Keller. Mr. Hawley? Good morning, and may it please the Court, Benjamin Hawley for the United States. The problem with the defense argument on the timing here is that it would require or not start the clock, one-year clock, until Mr. Cazares was certain that he would be deported, that is, when he was actually removed, not just a virtual certainty. He certainly knew that. The government's argument is he knew the facts at the time he was advised, but even if the Court disagrees, he knew it at the time of the sentencing, he knew it at the time he was placed in proceedings, and he knew it by the time the immigration judge ordered him removed. How would he have known it at the time he was advised? He knew the relevant facts at the time he was advised. No, but the, I don't know, or I shouldn't say I don't know, what do you think? Actually, I'll change it again. The phrase, you know, you're likely to be deported, never say never. How is that a statement? What does that mean? It's a confounding statement, never say never. And are you, do you want us to say that's pretty close to or even the equivalent of it's virtually certain you're going to be deported? So I think the question, now that I've reformulated it, is what does never say never mean? So first, we're not arguing that that is the equivalent of virtually certain or worse to that effect. We do argue that it's more than just that you may be removed. Through, Mr. Pachter kind of characterized his advice several different ways when being questioned by the parties and by the district court about the advice he had given. And he was saying, more likely than not, likely, never say never. I took that to mean, and the district court in its findings took that to mean that, look, it's not 100% certainty. There could come up something he, the district court talked about asylum. Maybe that would be applied. And so that's what the attorney was talking about. Like, look, I can't predict immigration proceedings. But again, the government is not now arguing that that was the equivalent of virtually certain. We agree that the advice does not comply with the standard put up in Bonilla and then Rodriguez-Vega. But again, that ultimately, the court doesn't have to reach that issue because of the timing. And it becomes an issue of when were the relevant facts known? And at the very latest, it was at the time the immigration judge- And you're saying that the relevant facts are the fact that he was what? The fact of the advice. Whether that advice was legally sufficient or not is the legal question, if it was legally sufficient. But again, even if the fact needs to be that it was virtually certain he was being removed, that came at no later than the point when the immigration judge orders him removed. Why is it virtually certain there? Because you have the person in charge of making that decision, determining that you should be removed. You still have an appeal. Of course. And that's where it's – that's why the standard's not certain. It's virtually certain. A judge could be overturned on appeal, but in general, and particularly in the facts of this case, when he says I'm constrained by precedent, it's at that point virtually certain that he will be removed. And again, as I said, the standard is not certain that he will be removed. I mean, this is the whole problem with our decision in Rodriguez-Vega is I don't know what statistics we were drawing on to say that it was virtually certain. Again, Padilla was just simply – was simply relying on the fact that there was a statute that made you removable. The fact of the statute, everybody's assumed to have to know that. But it seems to me that the virtually certain is a – is a finding about the exercise of prosecutorial discretion. I agree with the Court that the language is vague. We, of course, would have preferred a different outcome there. And for that, it – I don't know how he's supposed to figure – I don't know how Mr. Caceres is supposed to know that it's virtually certain. I don't know how he figures that out. I don't know how we figured it out. So I don't know how he's supposed to figure that out. Well, I think we just have to use the words to mean it's obviously not certain. It's something less than certain, and it's obviously, according to Rodriguez-Vega, more than likely or probably. At the point the immigration judge is ordering him removed, in the government's view, that puts you in that virtually certain, nearly certain, not 100 percent, but pretty close category. So he knew it when he got the NTA? We think he – yes. But even if the Court disagrees with that, he knew it at the time the judge removed him. Basically, the Court can pick any number of these dates when it became virtually certain to him, and he didn't file within a year of any of those. Except for within a year of the BIA's decision. Correct. He did file within a year of that after he was then physically removed, waited a few months in Mexico, came back, was prosecuted, and then a few months into that process is when he finally filed the petition. If I think that – if I thought that this was timely, what happens? Then the Court would go to the prejudice analysis of the petition. Okay. Let's go to the prejudice analysis. So tell me what happens if I think it's timely. So here – then the question becomes, would it have been rational for Mr. Cazares to reject the plea offer and then do one of – the only two options left, either request a plea to a lesser offense or proceed to trial. Here the district court found that that wouldn't have been rational in his case for a few reasons. One is that the facts here were more aggravated than your standard alien smuggling case, and so the court found that it was not plausible that the government would have offered him a plea to a lesser offense. The aggravated nature of those facts is that he had – was transporting 10 or 11 people in the bed of a truck, drove at what the multiple agents described as an excessive speed in a crazy manner, potentially putting them at risk. And he admitted that this was his fifth time doing so within a month. So there's no reasons based on those facts, as the district court found, that the government would have offered a plea to something less. Moreover, and incorporating that slightly, it would not have been rational for him to go to trial. And the reason there, as the district court found, is that this was a case that was readily provable. The defense attorney, Mr. Pachter, and the court agreed there's no defense on the merits here. So if he rejected the plea agreement, he would have been getting a higher sentence because he would have lost acceptance of responsibility and fast-track points, and it still would have been virtually certain that he was being deported. Why isn't it potentially reasonable because for the man to say, I am going to go to trial, the facts are very strong against me, I don't – I certainly don't want to be removed, I'll do anything not to be removed, I have a home, a wife, I've been here many years, children, I've always paid my taxes, it would be essentially the end of life as I know it to be removed. I'm going to take my case to 12 individuals and see what happens. What's irrational about that? I can tell you in my court, very often I get people who decide to go to trial, even though the facts are overwhelmingly against them, they're going to take their chance. What's wrong with that? Well, and Mr. Pachter here testified that had Mr. Gazaris wanted to do that, he would go to trial on a meritless case, he had done so before and was willing to do so again. Again here, the reason would be that Mr. Gazaris essentially took the most rational course, that is, he got that paragraph in the plea agreement or the advisal in the plea agreement so that he wasn't getting a certain deportation, he wasn't stipulating to it, but he was still getting the lesser sentence with the acceptance and with the fast-track. So he was minimizing his sentence and still giving whatever shot there was in immigration proceedings, whereas if he had gone to trial, then he would have more likely – he wouldn't get those acceptance points and the fast-track points, so he'd have a higher sentence and still deportation would be virtually certain. No, but he wanted to ring the bell. He wanted to see if he could grab the brass ring. He wanted to see if he could have one juror decide, this guy is too nice for me to enforce the law – or not enforce the law, for me to find the government has proven its case beyond a reasonable doubt. What's wrong with that scenario? The answer is essentially that it was – the most rational course of action for him was to minimize the sentence and have some shot at finding deportation, and that's exactly what he got with the approach that he took. But let's go back to that. Given the plea agreement had something in there, a stipulation that he would be removed, and the government came down and said, okay, we can change that, that he may be subject to deportation because of the plea, what would give him any reason to believe that if he said no to that, the government may have done more? I mean, that's all he's got to prove. I'm not sure I understand. In other words, the government would have kept all that out of there about deportation at all. I'm sorry. I'm not sure I understand the question. Well, the original plea agreement said a stipulation he'd be removed. Right. He bargained that he would only be subject or may be subject to deportation. Right. What gives him the idea that he won't get a better result in rebargaining with the government? Well, the only way that that would get better for him is if it was a different charge, something other than the Alien Smuggling 1324. And because the facts were aggravated here and he admitted that he had done so five times within a month, there's no reason to believe that the government would have offered a lower plea to a lesser charge. Mr. Gazaris points out, and Rodriguez-Vega did the same, that — I was going to say, his argument, what are you going to do with that? That there are prior cases that have done that. The problem with just adopting that without looking at the facts of this case is it essentially becomes a per se rule that there's always prejudice, at least in the Southern District and I would hazard in every district, where there's been an initial charge of a 1324 and then they drop it down to something else. The district court — Since we didn't examine the facts in any of those cases but simply cited these unreported cases in which a lesser stipulation was reached in the case, it's going to be very difficult to find that this is not prejudice and that it's not a per se rule. Well, and that's our concern, is that I don't think Rodriguez-Vega intended, and even if it did, this court shouldn't find that it does become a per se rule because then this prejudice inquiry would be omitted, would go away in every case. Well, if we think that we're — if we think that Rodriguez-Vega stands for that proposition, we find prejudice, then what happens here next? So if the court decides that — Timely, and there's prejudice. Now what? Then the petition — then the court should reverse the district court's denial of petition. And everything goes away? So we've got — we have three different matters here, right? So it vacates the original conviction and will necessarily then vacate the second conviction as well? There would be, yes, the knock-on effects, but then the government could retry potentially Mr. Cazares for that first case and then go forward from there. So it would eliminate the violation of the supervised release? I believe so. I haven't researched that in depth, but I think it — that was certainly the district court's view. Unless the court has any further questions? I don't believe so. Okay. Thank you. Thank you. Mr. Keller, I'll give you a minute. I'll try to be quick. I know it's been a long morning. Just three brief points. First, Judge Bybee, to maybe more directly answer your question about where Rodriguez-Vega got this virtually inevitable fact, essentially. Virtually certain. I'm sorry, virtually certain language. I mean, I will note that in Rodriguez-Vega, there was an amicus brief from an immigration organization that, as I recall, sort of affirmed the practical reality that in their experience, if you're charged and convicted of an aggravated felony, you're going to get removed. And I don't know if they use a number, but — Yeah, I remember seeing the footnote that you refer to. I'd like to know what that brief said. Since we didn't cite any statistics, I'd like to know what their statistics were or whether it was simply impressionistic. I mean, I know in Rodriguez-Vega, we cited two cat statistics that showed that the number of people who get cat relief, I think it's much less than 1 percent. And that was sort of the main form of relief the government claimed that aggravated felons could receive. Second, just briefly on the timeliness issue, I mean, I think for me the crux of it is, is when Mr. Casares knew or should have known that his removal was virtually certain. And with respect to Ed Schmidt, I just don't think the notice to appear told him that, nor do I think a preliminary decision by an I.J. would tell him that. I think he was entitled to wait to see how the administrative process played out. And at that point, I think arguably then he was on inquiry notice that, okay, you know, I was told I only might be removed, and at this point, maybe I wasn't — maybe I wasn't actually properly advised. So if I understand that, your point in time from when we should start the one-year clock is his removal? Is that what you're arguing? Yes. No earlier than, I guess, the BIA decision, although as an aside, this court could even go back a little bit. And when Mr. Casares hired his immigrant — I'm sorry, his defense attorney, his second defense attorney to look into the ineffective assistance. If you think at that point Mr. Casares was on notice that he might have received ineffective assistance, that date was also within a year of when he filed the petition. The Court has no further questions. I don't think so. Thank you very much. We thank both counsel for the — for the argument. With that, we've completed the oral argument calendar for the day. The Court is in recess. All rise.
judges: Bybee, N.R. Smith, Stein